## MOORE v. ARKANSAS PIPE LINE CO. et al.

### No. 5494.

Court of Appeal of Louisiana. Second Circuit.

Oct. 29, 1937.

On Rehearing April 1, 1938.

After Remandment Feb. 6, 1939.

Rehearing Denied March 8, 1939.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, for appellants.

Harry V. Booth, of Shreveport, for appellee.

TALIAFERRO, Judge.

Plaintiff sued for and was awarded compensation on the basis of total disability, for the duration thereof not exceeding 400 weeks, at the rate of $20 per week. He alleges and contends that while performing the duties of his employment on April 4th and 6th, 1936, he experienced two accidents, within the meaning and intendment of the Workmen's Compensation Law, Act No. 20 of 1914, as construed by the courts of the state, resulting directly or indirectly in the degree of disability found by the lower court. Defendants deny that plaintiff suffered any accident at all on said dates and specifically ascribe the impairment of his ability, if any, which is not conceded, solely to pre-existing diseases. In the alternative, defendants contend that if plaintiff did have an accident of any sort, he has entirely recovered from its ill effects and is now and has been since July 1, 1936, able to do manual labor. Compensation was paid him to that date.

The suit was instituted against the employer and its insurer, Fidelity & Casualty Company of New York. They have appealed.

On Saturday, April 4, 1936, plaintiff was one of a crew of men engaged in the task of lowering strings of six-inch iron pipe into a trench dug for its reception. The process of assembling and lowering the pipe was on this wise: Joints of it would be screwed together on poles, called skids, alongside of the trench. The string of pipe would be gradually shoved forward by the workmen by pry poles until it slid into position on the bottom of the trench. One end of the string of pipe was kept elevated so that the string could be progressively lengthened by screwing additional joints thereto, while the other end would be covered with dirt. The record does not disclose the length of these joints of pipe nor the number united before lowered into the trench. Plaintiff claims that between two and three o'clock the afternoon of April 4th, a line of the pipe was on skids ready to be placed in the trench, but there was a bow in it; that they were endeavoring to "line the pipe up over the ditch on poles and had to skid it over to get it in line"; that it required unusually heavy lifting and straining to do this; that the pry pole used by each workman was five or six feet long, three or four inches in diameter, and weighed not exceeding 30 pounds; that he was in a stooping position when executing the physical movements needful to straighten the pipe,

and specifically relates the facts of the alleged accident to be as follows:

"Q. State to the court just what happened, when you first began to exert your muscular strength to raise the pipe? A. I had pulled up on the pole that I had and kind of jerked and pole kind of slid and I reached under to get a better hold, and in coming up put on all the power I could and kind of snatched and my right foot slipped and that threw the weight on my left foot, and it caused a severe pain in the back, and I stood on the pole a few minutes, stooped over with my weight on the pole.

"Q. Stooping over with your weight on the pole? A. Yes, sir.

"Q. You say that the pain struck you in the lower part of the back? A. Yes, sir.

"Q. What side? A. Kind of on the left side, felt like in the center of the backbone, felt inside.

"Q. When you took the second jerk on the pipe, while in that position, you felt this pain? A. Yes.

"Q. Now, when you took the second grip on the pipe with your pole, were you in a greater or a less stooping position that before? A. I was in a greater stooping position that I was before, stooping some lower."

He states that he "went ahead and made the rest of the day; didn't do so much work. I went below there and fixed the fence across the right of way". He did not work the following day, a Sunday, but returned to work on Monday morning, the 6th. No more pipe was to be laid. He was directed to assist in measuring off the right of way (trench) to be filled, in strips of 50 feet, and in doing so carried one end of a tape line. He stooped over to pick up a little stick, a catch developed in his back, and he was unable to resume an erect position. He lay upon a log for a while and, when his condition was observed by the foreman, he was sent to Dr. Doles, of Mooringsport, for attention. Dr. Doles only found the prostate gland enlarged and concluded that massaging and rest would remove or relieve his pain and discomfort. The patient was advised to return to his home. He was again seen by Dr. Doles on April 15th and, because his condition had not improved, he was advised to consult Dr. Harmon in the city of Shreveport. Dr. Doles thought it possible that plaintiff was suffering from a sacro-iliac sprain. He is positive that plaintiff in giving the case

history, did not refer to or mention any injury or accident prior to April 6th, although asked specifically if he had had any previous injury or accident. He did tell him of his experience on the 6th. He gave to Dr. Harmon the same case history as he did to Dr. Doles. No mention whatsoever was made of any injury on April 4th. Dr. Harmon found muscle soreness of the lower spine, enlarged and infected prostate, and minor infection of the gums and tonsils. Practically all the other physicians who physically examined plaintiff found the same infections. We are sure each had its incipiency long prior to March 8th, the day he began work for defendant. He was given prostate massages and other treatments by Dr. Harmon deemed to be appropriate for the relief of his ailments. These were repeated often. He made 64 visits to Dr. Harmon's office and was discharged on July 1st, with the advice that he was able to resume his usual line of work. He was further advised to continue the massaging and warned that not to so do, the improvement attained would be lost. Dr. Harmon was of the opinion that plaintiff's prostate infection was the principle source of his trouble. Muscle rigidity, subsequently found, he thought was due to a revival of focal infection following cessation of advised prostate treatment.

On June 30th, at defendant's suggestion, plaintiff reported to Drs. B. C. Garrett and Wm. Norphlett for examination. He was thoroughly checked. They were of the opinion that he was not suffering any disability to perform manual labor. It was on the opinion of these physicians and that of Dr. Harmon that compensation payments were discontinued and no further medical treatment given him at defendant's expense. He thereafter employed counsel who had an x-ray picture made of his lower back on August 27th, and his entire body closely checked and examined by four prominent physicians of the city of Shreveport. These examinations were made during the months of September, October and December, 1936. Defendants also had a picture made of plaintiff's back by an experienced roentgenologist. Neither of the pictures disclosed any bone injury, that is, no fracture or displacement. Both revealed a "lipping" (exostosis) at the joints of the eleventh and twelfth thoracic vertebrae and of the first lumbar vertebra. This process, called "lipping" is a growth at the back-

bone joints and may be due to trauma of the cartilage or disease. It results from nature's efforts to correct the ill effect of injury or disease, and may cause serious pain and discomfort. Flexation of the involved joints is more or less impaired, and chances for injury to the back materially enhanced thereby. Whether this lipping has brought about an arthritic condition at the locus, there is not unaninimity of opinion. There is also disagreement concerning the period of its existence. The decided preponderance of the testimony is that its incipiency antedated the alleged accidents.

There is no dissent among the several physicians who gave testimony in the case on these points:

(1) That plaintiff's disability, regardless of its nature, present and past, could have been caused by focal infection or by trauma, or by a combination of the two;

(2) That if plaintiff suffered the injury alleged by him on April 4th, the ill effects of it would have soon disappeared, but for the influence of the infection. Not one of the nine doctors was willing to say that plaintiff was totally disabled. Dr. Herold was of the opinion that he was not able to resume work which would require any straining, while Dr. Paine was certain in the belief that he would have to improve materially before he should resume oil field work. Other doctors, sworn for plaintiff, were not interrogated on this point. Defendant's physicians were of the opinion that he was able to perform manual labor. Plaintiff's physicians thought he experienced some sort of trauma of the lower back and that this injury aggravated and moved to increased activity the dormant infections, and the two together produced the disability complained of. An equal number of physicians for defendant, of as extensive experience and having as splendid reputations, are as equally positive that disease alone accounts for plaintiff's trouble. All these physicians advance reasonable and plausible theories upon which they predicate their opinion. All are honest, no doubt, but all are not correct. Several of them were certain plaintiff's disability could be due to the prostatic condition alone.

The medical testimony is inconclusive as to material points in the case, save as above mentioned. It certainly does not establish to that degree of certainty necessary to definitely make a finding thereof, that plaintiff's present disability, regardless of the extent, is due to an accident of the character he claims to have experienced on April 4th.

Plaintiff's version of the accident on April 4th is substantially corroborated by only one fellow workman. It is passing strange that of the many men who were there at the time moving the pipe and filling the trench, only one could be induced to testify in his behalf. Usually fellow workmen are eager to aid an injured brother when their testimony will do so Two of these workmen testifying for defendants state they did not see the first alleged accident and never heard such happened. The foreman of the crew was there when the "bow" in the pipe was removed and is positive no accident occurred and is positive plaintiff did not tell him of it, although plaintiff says he did.

We are not convinced that plaintiff was injured at all on April 4th. It is virtually unbelievable that when the facts were so fresh in his mind, he would have omitted mentioning this incident to Drs. Doles and Harmon when giving the history of the case; and especially is this true when Dr. Doles quizzed him particularly as to accidents or injuries prior to April 6th. So far as the record discloses, no mention was made by him of the alleged accident on April 4th to anyone, until he was examined on June 30th by Drs. Garrett and Norphlett. It is not improbable that at that time he had sensed the probability of the discontinuance of compensation. It is shown that many persons have this same affliction and never know it until revealed by the x-ray. Some cases are accompanied by intense pain and some not. It seems improbable to us that if plaintiff had undergone the straining and experienced the pain he says he did on April 4th, he could have continued to work. He returned Monday to do any work assigned him and no doubt was given light work because there was no more pipe to be connected or laid. It also seems strange that the violent strain did not incapacitate him for work, while the mere stooping to pick up a stick did so. It is also a significant fact that subsequent to discontinuance of compensation payments, so far as the record discloses, plaintiff was not treated by any physician. He was advised to continue the prostatic treatment, but evidently did not follow this advice. If

impecunious, a splendid Charity Hospital in the city of Shreveport would minister to his ailments. These facts tend to strongly support defendants' contention that if plaintiff had any accident at all in April, 1936, the ill effects of such had been removed by July 1st and plaintiff's present disability, if any, is simply the result of infectious activity following cessation of the prescribed treatment. We concur in this position. Apparently, plaintiff was willing to sit idly by and allow his system to again become charged with poison from the infected areas, rather than try to secure a measure of relief which probably would unfavorably affect his chances to procure additional compensation.

Plaintiff argues alternatively that should it be held that the testimony does not establish that an accident occurred on April 4th, he is still entitled to recover on account of the accident of April 6th, under the case of Jackson v. Travelers Insurance Company, 180 La. 43, 156 So. 169. In view of the conclusion reached by us on other issues of the case, we are not called upon to decide whether the incident of April 6th amounted to an accident within the meaning of the Workmen's Compensation Law, as expounded in the Jackson case. We held that the effects of that incident had been effaced on or before the date plaintiff was discharged by Dr. Harmon on July 1, 1936, and that whatever present disability plaintiff has is directly due to diseases antedating the alleged accident.

Plaintiff's case has not been made out to the degree necessary to warrant recovery.

For the reasons herein assigned, the judgment appealed from is annulled, avoided and reversed, and plaintiff's suit dismissed at his cost.

HAMITER, J., dissents.

On Rehearing.

DREW, Judge.

When this suit was originally before us, it was decided by a divided court. Later a rehearing was granted and the case has again been submitted to us for decision.

After again carefully studying the case, there still remains a divergence of opinion in the minds of the three Judges of this court; and, in the interest of justice and that justice may be done between the parties litigant, we deem it advisable that the case be remanded to the lower court for the admission of any further testimony either litigant wishes to offer which pertains to any of the issues involved.

It is so ordered.

Opinion After Remandment.

This is a suit for compensation. It has been here twice before. The case was originally appealed from the District Court by defendant from a judgment awarding plaintiff compensation for a period of not more than 400 weeks for total and permanent disability. By a divided court we reversed the lower court and rejected plaintiff's demands. A rehearing was granted by us but before the second trial here, plaintiff filed a motion to remand on the following grounds:

"That this Honorable Court in rejecting your mover's demands and in reversing the judgment of the trial court, has held that none of the doctors who testified for and on behalf of your mover stated that your mover was totally disabled to do work of a reasonable character at the time of trial.

"Your mover now avers that since the accident of April 4, 1936, he has been unable to do any kind of manual labor.

"Your mover now avers that all of the physicians and experts who testified in his behalf at the trial of this cause, would have testified, had they been asked the direct question that your mover was totally disabled to do any work requiring any considerable degree of manual labor, which is to say that said experts would have testified if asked the question that your mover was totally disabled at the time of trial to do work of a reasonable character, as will more fully appear by affidavit of four of said experts annexed hereto and made a part hereof.

"That the failure on the part of your mover's counsel to have asked the direct question was purely inadvertence and oversight.

"Your mover further shows that this Honorable Court held that your mover could have obtained treatment for said prostate gland at the Shreveport Charity Hospital, whereas, in truth and in fact, your mover could not have obtained treatment of this condition at the Shreveport Charity Hospital, or at any other place, as far as your mover knows.

"Your mover shows that during the entire period lapsing from the date de-

fendant ceased to pay your mover compensation to the present time, he has been in an impoverished condition; that his wife and family have been on relief; that he has no funds to have paid a licensed physician for services to treat his prostate gland.

"That he annexes hereto an affidavit of A. Jerome Thomas, M. D., to the effect that the Charity Hospital would not treat his type of case, nor would the Charity Medical Unit of Shreveport and Caddo Parish, Inc., treat his type of case."

To the motion were attached the affidavits referred to in said motion.

After hearing the case reargued, we remanded it to the lower court for the admission of any testimony either litigant wished to offer pertaining to any issue of the case. Trial was had below and considerable additional testimony adduced, and the lower court again awarded judgment for plaintiff for 65% of his weekly wages for a period of not more than 400 weeks. Defendant has perfected an appeal from said judgment and is now prosecuting same.

Plaintiff alleged that while performing the duties of his employment on April 4th, 1936, he was assisting in lifting a long string of 6-inch pipe with a pole; that while in the process of lifting said string of pipe, his right foot slipped, whereupon he felt a sharp and severe pain in the lower sacro region of his back; and that on April 6, 1936, two days later, he stooped over, whereupon a very sharp pain struck him in the same region, and he was unable to regain an erect position. His employer was immediately notified and plaintiff was sent to defendant's physician for treatment; that he was treated by defendant's doctors until July 1, 1936, and paid compensation. On the last mentioned date plaintiff was released by the doctors and the compensation payments stopped. He alleged that his condition had continuously grown worse and that he had never been able to perform manual labor since the date of the injury; that he is now totally and permanently disabled.

Defendant denied that plaintiff had any accident while in its employ; that if he did and incurred any disability, he had fully recovered on July 1, 1936. Defendant further contends that if plaintiff is disabled, it is caused solely from focal infections of the tonsils, teeth and prostate.

In our former opinion, we found as a fact that plaintiff did not prove he had an accident on April 4th or 6th, 1936, while in defendant's employ. We are now of the opinion we were in error in so finding.

We dislike to quote testimony extensively but, due to the difference of opinion among the members of this court, we deem it necessary to do so in the case at bar. Plaintiff testified that on April 4, 1936, he was working on a pipe line for defendant. It was known as a 6-inch screw line. The pipe is first placed on the ground and screwed together with collars. After it is all together it is then placed into a ditch and buried. In assisting to get the pipe into the ditch, plaintiff alleged he received the strain and injury complained of here. He described the alleged accident as follows:

"Q. Mr. Moore, what day did the first accident happen? A. It happened on Saturday afternoon. (This was April 4, 1936)

"Q. Describe to the Court the manner in which it happened, what were you doing and how it happened? A. We had the pipe line on skids, and were going to skid it over to the ditch, that was dug in order to bury the pipe, and the line was bowed, had a bow in it and we were trying to line the pipe up over the ditch on poles, and had to skid it over to get it in line.

"Q. Was the line pretty heavy, where you were working? A. Yes, sir, very heavy.

"Q. You say that the line was bowed, what do you mean by that? A. When the pipe gets warm it expands, causes it to bow, will not stay straight.

"Q. Is there more strain or less strain on the pipe where you are moving it, or trying to move it, where the pipe is bowed than when it is straight? A. Well, at times there is more strain in the pipe that is bowed than when it is straight.

"Q. Mr. Moore, just how were you all trying to move that line, what were you working with. In what manner were you trying to move the pipe? A. I had a pole about three or four inches in diameter and would stick the pole under the pipe and lift up so as to slide it over on the skids.

"Q. In other words, had a pole something like a crowbar? A. No, sir, just a straight round pole.

"Q. How long was that pole? A. Five or six feet.

"Q. How heavy? A. Not very heavy, 25 or 30 pounds.

"Q. How many men at that point at the time when you got hurt? A. No one on the stick with me, but there were others there in that gang present at the time.

"Q. Was there anyone there close to you? A. I do not know, there were several others had sticks on the ground, each one using a stick and trying to push it over.

"Q. What position was your body in, what posture, when you attempted to move the pipe, that is, the position of the body at the time it occurred? A. Kind of stooping over and pulled on the pipe, kind of stooping over, raising up.

"Q. Were you in the position of exerting your man power to raise up, at the time that it happened? A. Yes, sir.

"Q. State to the court just what happened, when you began to exert your muscular strength to raise the pipe? A. I had pulled up on the pole that I had and kind of jerked and the pole kind of slid and I reached over to get a better hold and in coming up put on all the power I could and kind of snatched and my right foot slipped and that threw the weight on my left foot, and it caused a severe pain in the back, and I stood on the pole a few minutes, stooped over with my weight on the pole.

"Q. Stooping over with your weight on the pole? A. Yes, sir.

"Q. You say that the pain struck you in the lower part of the back. A. Yes, sir.

"Q. What side? A. Kind of on the left side, felt like in the center of the backbone, felt inside.

"Q. When you took the second jerk on the pipe, while in that position you felt this pain? A. Yes.

"Q. Now, when you took the second grip on the pipe with your pole, were you in a greater or a less stooping position than before? A. I was in a greater stooping position than I was before, stooping some lower.

"Q. What did you do the balance of the day. Did you continue to do that kind of work the balance of the day, or what work did you do? A. I went ahead and made the rest of the day. Didn't do so much work. I went below there and fixed the fence, across the right of way.

"Q. What time of day did this happen, about what time? A. It was somewhere between 2 and 3 o'clock.

"Q. What day of the week did you say this happened on? A. It happened on Saturday afternoon.

"Q. Then did you work the next day? A. No, sir, the next day was Sunday and we did not work that Sunday.

"Q. Did you return to work on Monday morning? A. Yes, sir.

"Q. What, if anything, happened on Monday morning when you returned to work? A. On Monday morning, went there and started to work and worked about 30 minutes and we were measuring off the right of way in 50-foot strips to be filled, and I had one end of the tape and went ahead to measure off the strip and I stooped over to pick up a little stick, and stooped over and was unable to raise back up. Something caught in my back, so I was unable to raise up.

"Q. Unable to recover your body to a standing position? A. Yes, sir.

"Q. What did you do? A. I stood there stooped over that way and took a stick and shoved up and found I could not walk. I did not want to give up, thought I could go ahead and maybe work it out and it would disappear like Saturday, thought I could go ahead and make the day, the more I tried to stand up the worse it got and I had to give up.

"Q. Then what did you do, were you carried anywhere? A. Yes, sir, someone around there took me.

"Q. How about the foreman? A. He come along after I quit work and I told him about it and he sent me to a physician, doctor. I went and lay down on a log and then went back to the station about half a mile from where we were working and stayed there a few minutes, and one of the trucks of the Company came along, and carried me to the house to the rooming house. Someone afterwards taken me to the doctor.

"Q. The Company doctor? A. Yes, sir.

"Q. What doctor, Dr. Doles?"

Plaintiff went back to Dr. Doles on Friday, April 10th, and was sent by him to Dr. Harmon who treated him for approximately 90 days when he discharged him, telling him at the time that he would need further treatment, but it would be at his (plaintiff's) own expense.

At the time of the accident, plaintiff was 32 years of age, married and had three children. He only had a Fourth grade education and had always made a living for him-

self, wife and children by performing manual labor. Plaintiff further testified as follows:

"Q. Have you tried to do any work, made any effort to do manual work, that required the use of the muscles of your back since the accident? A. Nothing to amount to anything. I have not been able to get out and do anything, when I am on my feet three or four hours, I am in misery.

"Q. Did you have any trouble before this happened? A. No, sir.

"Q. Ever had any trouble with any back injury before this happened? A. No, sir.

"Q. Ever had any accident to your back before this happened. A. No, sir."

Plaintiff began to work for defendant on March 8, 1936. The job on which he was working was completed on April 6th or 7th, and all of the extra crew, of which plaintiff was one, were laid off.

Plaintiff stated that the picking up of the stick on April 6th did not amount to anything, but when he bent over to pick it up he could not straighten up, due to a catch in his back. On cross-examination he testified as follows:

"Q. Mr. Moore, you say that you never had any trouble with your back prior to April 4th? A. No, sir.

"Q. Never said that your back hurt you to anyone? A. No, sir, in no way, only when picking cotton, stooping over a long time, might have a little backache and get down on my knees and crawl in picking cotton. Stooping over picking cotton for three or four hours, only time.

"Q. What other work did you do that caused you to stoop over, other than picking cotton? A. I have done lots of other work, grubbing?

"Q. How long ago? A. This past winter.

"Q. Did that cause your back to hurt? A. No, sir.

"Q. You say that that pipe was not in the ditch on April 4th? A. Yes, sir.

"Q. You were lifting with a pole, along with several other men? A. Yes, sir.

"Q. That is when the pain come in your back? A. Yes, sir, that is when the back hurt.

"Q. Did you tell anyone about it? A. Yes, there were several there that noticed me at the time I give down on the stick.

"Q. Did you tell anyone that you were hurt? A. Well, the foreman on the job asked what was the matter.

"Q. Who was the foreman? A. Mr. Baldack.

"Q. Did you tell Mr. Baldack on Saturday, April 4th, that you were hurt? A. I told him that I had a pain in the back, when trying to raise up.

"Q. Did you tell him that you had gotten hurt lifting, or anything like that? A. Well, no—

"Q. I am asking you what you told him. Don't say what anyone told you. I am asking you whether you made that statement to anyone? Did you on Saturday, April 4th, tell Mr. Baldack that you had been hurt on that job? A. I told him I was bending down, on the stick, picking up on the pipe and he says—

"By Mr. O'Quin: We object to what anyone said.

"By Court: The objection is sustained. Just tell what you said. A. That is all I told him at that time.

"Q. You did not work on Sunday? A. No, sir.

"Q. Did you go to a doctor on Sunday? A. No, sir.

"Q. Did you tell anyone that was working with you, at the time that you had been hurt on that job? A. Yes.

"Q. Whom did you tell? A. Well, I told several.

"Q. Who did you tell, mention their names? A. Well, there were a lot of the boys on the job, that I did not know their names, worked with them but I did not know their names, do not know their names yet. One of the boys working there, he was there on the job and I told him I had pain in the back, and he told me—

"By Mr. O'Quin: We object to what someone told you.

"Q. Tell us one that you told? A. Prudhomme.

"Q. Where is he? A. He is supposed to be here at the Court House.

"Q. He was working there at that time? A. Yes, he was.

"Q. Now, which time did you hurt yourself the most on April 4th, Saturday, or on Monday, April 6th? A. Well, right at the time that I bent down on the stick with the pipe and picked up, I suffered lots of pain, lasted long in a moderate way, kind of felt sore, dead ache, then on Monday when I stooped over to pick up the stick it caught me in the back, was unable to move, to straighten up, and it has bothered me

more or less ever since, not yet perfectly healed, gradually getting worse.

"Q. You are sure that the first trouble that you had was on Saturday, April 4th? A. Yes, sir.

"Q. When you were lifting the pipe to put it into the ditch that had been prepared for it? A. Trying to shove the pipe over the ditch.

"Q. Trying to push it over to the ditch, that had been dug for it? A. Yes, sir."

And on redirect examination, he said:

"Q. Now, about the foreman on the job, Mr. Baldack, when you told him that you had a pain in your back, what did he say?

"By Mr. O'Quinn: Objected to as hearsay.

"By Court: I think the whole conversation is admissible as a part of the res gestae, what occurred immediately after the alleged accident.

"To which ruling of the Court, counsel for defendant excepts and asks that this note stand in lieu of formal bill of exceptions.

"Q. Was that on Saturday? A. Yes, sir.

"Q. At the time that the accident happened? A. Yes, sir.

"Q. You said that you had told him, at that time, that you had a pain in the back? A. Yes, sir.

"Q. Then what did he say? A. He says, —'Hell, no use you trying to move the pipe by yourself with that stick, have enough men here to eat the whole damn thing up.'

"Q. Said he had enough men there to eat the pipe up. A. Yes."

George Prudhomme, a fellow workman of plaintiff, testified to the accident as follows:

"Q. Do you know the plaintiff in the case, Henry O. Moore? A. Yes, sir.

"Q. How long have you known him? A. Two years.

"Q. Were you working with him on a job for the Arkansas Pipe Line Company in March and the early part of April, this year? A. Yes, sir.

"Q. Where were you working? A. We were laying a pipe line from Oil City to Rodessa.

"Q. What kind of work were you doing? A. Well, I was working in the ditch, in the ditch behind the pipe.

"Q. All working in the same crew? A. Well, the ditching gang was, the pipe gang were ahead of us.

"Q. Did you see Mr. Henry O. Moore about the 4th of April of this year? A. Yes, sir.

"Q. Was he working there on that day? A. Yes, sir.

"Q. What kind of work were you doing that day? A. Well, finishing the ditching and back filling and lowering the pipe.

"Q. What kind of a pipe line was that they—you all—were trying to lower in the ditch, was it in one string or in separate joints? A. What we term one string then.

"Q. Did you see Mr. Moore at that time? While doing that work? A. Yes, sir.

"Q. What was he doing. I will ask you this first, while you were there did you see anything unusual occur? A. All I seen we were fixing to lower the pipe in the ditch and were under an awful strain, set it down and it kicked out of the ditch.

"Q. Was Mr. Moore working with that pipe at the time? A. Yes, sir, four or five around trying to push it over, and Moore was stooping down, and he grabbed himself and says I hurt my back. Mr. Baldack was there, and says no use three or four men pushing that pipe, enough men there to eat it.

"Q. Were you lifting on the pipe too? A. Yes, sir, I was there trying to ease it over, push the pipe in the ditch. Had these skid poles under the line.

"Q. After this happened, what did you see Mr. Moore do, did he continue to push on the pipe? A. He stood up there, all I seen him do, hold on the stick, that is all.

"Q. Did you work with the gang all of that Saturday? A. Yes, sir.

"Q. All of Sunday? A. No, sir, we laid off Sunday.

"Q. Had you all been laying off Sundays before that? A. No, sir, as well as I recall we worked every Sunday until then. This was about the winding up of the job.

"Q. On Monday morning, did you return to work? A. Yes, sir.

"Q. Did you see Mr. Moore on the job on Monday morning? A. Yes, sir.

"Q. What kind of work did you all do on Monday? A. Fixing to back fill.

"Q. Was he pushing on any pipe on Monday? A. No, sir.

"Q. Did you see him do anything on Monday, out of the ordinary, if so what was it? A. Well, all I seen on Monday he went there and went to work measuring off the foot sections, as they paid fifty cents a section, back filling and I was close to Mr. Moore, we were close together and he was helping the timekeeper, called Chubble.

"Q. What doing? A. Measuring off and Moore stooped over to pick up a stick, stooped down and grabbed himself said he had pain in the back and he walked off and lay down on a log.

"Q. Did you see him work any more that day? A. No, sir, he did not work any more that day. We went on to work down the ditch, and they sent me to carry the tongs to the men, and when I came back he was gone."

On cross-examination, he said:

"Q. It was on Saturday, April 4th, when you and Mr. Moore were skidding the pipe into the ditch? A. Several of us were around the pipe.

"Q. When you say Moore got a catch in his back, what did you see him do? A. He stood humped over, stooped over.

"Q. After you saw him there standing stooped over, didn't he stay on the rest of the day? A. Yes, sir, it was along in the afternoon three or three thirty and after that happened, they sent Mr. Moore down to fix the fence, and I did not see him any more that evening.

"Q. You do not know what he did? A. No, sir, he left.

"Q. Are you sure that he did not stay there and work with the gang? A. No, sir, he went to fix the fence, down the right of way."

The record contains the testimony of plaintiff's wife and four of his close neighbors who observed plaintiff around his home and on the streets of Cotton Valley, Louisiana, almost daily. Their testimony is that prior to April 6th, 1936, plaintiff was a supple man, moving about as any well man would, and that after that time he has been lame and unable to stand up or walk as he did before. He was bent in a humped position and was incapacitated to do any kind of manual labor. One of these witnesses had employed plaintiff in oil field work from 1933 until February, 1936. He was able to and did heavy manual labor during that time. When he left this witness' employ, he worked on the W. P. A. His foreman testified he was a capable worker and did not complain of any inability to work at manual labor. As soon thereafter as he could procure a job which would pay more money, he secured one with the defendant herein on March 8, 1936. There was no complaint as to his work with defendant, laying a pipe line, the very hardest kind of labor, until the date of the alleged accident. The record makes it clear that since that date plaintiff has not worked, and it also preponderates with testimony that plaintiff is totally disabled from doing manual labor.

It is not now contended that plaintiff is a malingerer, but the principal defense is that his condition is caused solely by the infection from his teeth and prostate, his tonsils having been removed soon after the first trial.

In order to show that plaintiff had no accident, defendant offered the testimony of Dr. Doles, to whom plaintiff was first sent on April 6, 1936, who testified that plaintiff did not tell him of any accident on April 4th. He testified in part as follows:

"Q. Doctor, did you examine the plaintiff, Henry O. Moore, on April 6, 1936, on a Monday? A. Yes.

"Q. What did you find at that time? A. I could not find anything on my examination, that is, no signs of bruises on the body. I examined his prostate and his prostate was a little larger than I thought it should be.

"Q. Doctor, do you remember whether or not you examined his tonsils? A. No, sir, I did not examine those.

"Q. Did you ask for a history of the accident, what occurred? A. Yes.

"Q. You asked him how he got hurt? A. I asked him that.

"Q. What did he tell you? A. He said he stooped over to pick up a little stick and a catch caught him in the back.

"Q. Did you ask him about any other accident? A. Yes, after going over him, examining him for a while I asked him specifically if he had been hurt before.

"Q. What did he say? A. Said he had not."

Dr. Doles further testified that he made no notes of the history of the case, as given him by plaintiff, until nine days after he first saw him, and that at the time he

thought plaintiff had a sacro-iliac sprain. He could not understand how plaintiff received that by merely picking up a small stick on April 6th. Dr. Doles testified further when examined as to the report he made to the insurance company:

"Q. You really thought at the time that he was suffering? A. Yes, sir.

"Q. You thought that he was a sick man? A. I thought he was suffering.

"Q. If you had not thought that he was suffering or a sick man you would not have sent him to Dr. Harmon. A. I would not have sent him home. I sent him home first.

"Q. You did not think that he had any other trouble, to cause the condition except the accident did you? A. I thought probable he had what we call a sacro-iliac sprain. That is what I thought of. That is what I thought probably it was.

"Q. Right before that on the same line of Question 8, after you had said the sole cause of the condition was the accident, you were then asked,—'If not, state contributing causes'. You answer what to that question? A. I do not know.

"Q. You put an X there, no contributing cause in your mind? A. There was a question there, I guess I meant to make a question mark instead of a check.

"Q. Probably so? See if you did. A. That is the statement there,—'if not state contributing cause'. Well, I do not know what I had in my mind, but it meant this that I thought it was a minor condition and did not pay much attention.

"Q. Doctor, let us assume as being true, that prior to April 4, 1936, this man never suffered with pain in the back; that on April 4th he had a pole and was moving some pipe, bending and stooping down, when a pain struck him in the back and since that time he has suffered every day with the pain in his back, accepting all these facts as true, would not your opinion necessarily be that he suffered a sacro-iliac sprain, as a result of that accident? A. Yes.

"Q. Be your opinion that he suffered a sacro-iliac sprain? A. Yes.

"Q. In other words, if he never had any pain there before, and has had pain there since, it follows almost that there was considerable strain there and really caused a sacro-iliac sprain? A. It could cause it, a strain could cause it."

Defendant next offered Mr. Baldack, the foreman on the job, who testified that he knew nothing of any injury to plaintiff until Monday, April 6th, between 8 and 9 o'clock A. M. His testimony on this point is as follows:

"Q. Did you know anything about any injury to him on April 4th? A. No, sir, none whatever.

"Q. On April 6th, on Monday, had he said anything about having been injured? A. No, sir. I came down to see that everyone had a 50-foot space, and he was lying on the ground not working, and I asked what was the matter and he says his back hurt, and I says how and he says he started to pick up a pole, and I asked him if it hurt bad and he says 'yes' and I sent him to the doctor."

Baldack further testified that he sent plaintiff by himself at approximately the time plaintiff claims to have been hurt, on April 4th, to fix or patch some fence. Plaintiff does not claim, and no other witness does, that plaintiff said anything about picking up a pole on the 6th. That was the day he attempted to pick up a small stick to get it out of the way of the tape line, being used to measure off fifty feet for each employee to fill in over the pipe line. We think plaintiff told the foreman that he had hurt himself lifting on a pole and was referring to the accident on the 4th.

Mr. Croom testified on behalf of the defendant that he was working on the pipe line with plaintiff. His job was a ditch digger, while plaintiff's was known as "power". He did not know of any accident that happened to plaintiff on the 4th and did not know anything happened to plaintiff on the 6th. He does remember hearing plaintiff complain of his back hurting two or three days before the job was finished; that this complaint was made either on Saturday, the 4th, or Friday, the 3rd, he is not sure.

Mr. Morrison began working on the pipe line on the 3rd of April and worked the 3rd, 4th and 6th. During those three days he heard plaintiff complain of his back and said he walked around humped over. He does not know whether this complaint was made on the 3rd, 4th or 6th of April.

No other members of the pipe line crew were placed on the stand. If plaintiff needed any more eyewitnesses to the accident, which we do not think he did, for, to our minds, he has sufficiently explained

why he did not have them in court. It was an "extra" gang job, that is, practically everyone on it, except the foreman, was an extra. When they completed this job, they started out in search of another, wherever it might be. Plaintiff testified that he did not know the names of the men who were working with him. This might seem strange to one who had never been around a similar crew. As a rule the greater part of the men are strangers to each other, and all of them go by nicknames. Plaintiff testified that he had made a diligent search, insofar as his condition and means would afford, to locate some of the men who were working with him at the time of the accident and, other than the witness, Prudhomme, he had only found one, who happened to be the foreman's son-in-law. His testimony in regard to this is as follows:

"Q. Have you worked any since the last trial of this case? A. Well, I tried to, Mr. Booth, but I couldn't do it. I went out when I had pain and misery and tried to saw wood to cook my kids something to eat and I couldn't do it.

"Q. Mr. Moore, have you tried to locate any of the witnesses or persons that might have seen this first accident on April 4th, since this accident occurred, that may have seen it, outside of Mr. Prudhomme? A. I tried to locate them, but I did not know their names. There is two boys I knew.

"Q. Their names? A. One was named Necto.

"Q. What was his first name? A. Well, they called one Chubby. I didn't know whether that was his real name or not, but that was what the boys called him.

"Q. Do you know any of the boys that were on the job except by nickname? A. Well, no, I don't.

"Q. Was there one of the workmen you talked to that might have seen the accident? A. Yes.

"Q. Why didn't you have him summonsed? A. Well, he was the son-in-law of the foreman, Mr. Baldack.

"Mr. O'Quin; I do not know that this has anything to do with what counsel is trying to bring out. It is hearsay and nothing else.

"(Argument)

"The Court: Go ahead.

"Q. All right, Mr. Moore, continue and tell why you have located for witnesses in Court but one workman who saw this first accident? A. Well, I didn't know their names and didn't know how to get hold of them. I couldn't find anybody else that could recall the boys' names that worked on the job. This fellow, Mr. Baldack's son-in-law, lives right here in town and I went to see him and he wouldn't go on the stand—

"Mr. O'Quin (Interrupting witness): I object if the witness is going to put hearsay in this record as to what this man told him.

"The Court: The objection is sustained.

"By Mr. Booth:

"Q. That is all right. Did Baldack testify in this case? A. Yes.

"Q. He is the foreman of the company? A. Yes.

"Q. And this man that was there was his son-in-law? A. Yes.

"Mr. O'Quin: If counsel wants to put this testimony in and let me get that witness on up here, we will see what happens about that.

"By Mr. Booth:

"Q. Mr. Moore, did you make an attempt to find out the names of these other men who were working around there and who might have seen the accident? A. Yes, sir."

But, to our mind, the strange thing is that the foreman did not produce his son-in-law to testify in the case; and further, he testified that he did not know the names of any of the men who were working on this job. Undoubtedly there must have been a record somewhere. These men were on the payroll and were paid by defendant. Another strange thing, to our mind, is why the defendant company did not secure some workman who was present, who would swear positively that plaintiff did not have the accident he claims to have had.

The principal reason for the holding in our former opinion that no accident had been proved, was that Doctors Doles and Harmon testified that plaintiff did not give them a history of his case, telling them of the accident on April 4th. As we have previously stated, Dr. Doles did not make a record of the history given him by plaintiff until nine days after he first saw the plaintiff, and his testimony, as a whole, shows that his memory on other important features of the case was not good. Plaintiff claims he did tell Dr. Doles of the accident which occurred on April 4, 1936. A care-

ful study of the record discloses that plaintiff did not give a history of the case to Dr. Harmon; that when he was sent to Dr. Harmon, which was on April 10th and not the 15th, as testified to by Dr. Doles, Dr. Harmon was out of town and Dr. Addison substituted for him and obtained from plaintiff a history of the case. Dr. Addison was not placed on the witness stand. Every other doctor who examined plaintiff thereafter testified that he told them that he was injured by an accident on April 4th, 1936; that he did not work on the following day, but returned to work on the morning of April 6th, and a short while after beginning work, stooped over to pick up a small stick and was unable to straighten himself up.

■ There can be no doubt about plaintiff having an enlarged prostate, bad tonsils and teeth prior to the date of the accident. None of these infections had given him any special trouble or in any way had prevented him from performing manual labor. After the strain he received on April 4th, which made its presence so plainly known to plaintiff on April 6th, he has been unable to perform manual labor of any kind. It might be said that if it had not been for his diseased condition, the strain or sprain would not have incapacitated him. However, it is certain that the injury received on April 4, 1936, was at least an accelerating cause of his present disability and, under the jurisprudence of this state, especially the following decisions, he is entitled to compensation: Freeda Jackson v. Travelers' Insurance Company, 180 La. 43, 156 So. 169; Renfrow v. Caddo Parish Police Jury, La.App., 155 So. 291; Anderson v. Louisiana Oil Refining Corp., 16 La.App. 294, 134 So. 343, and Patrick v. Grayson & Yeary, 13 La. App. 228, 127 So. 116.

It is unnecessary to discuss further the former opinion of this court, as it is almost entirely predicated upon the finding therein that there was no accident on April 4, 1936, and the statements made as to the right plaintiff had to receive treatment from the Charity Hospital in Shreveport, after he was discharged by defendant's doctor, were shown to be in error on the second trial below. It was also conclusively shown on the second trial that plaintiff was totally unable to perform manual labor.

■ We are convinced that the judgment of the lower court awarding plaintiff compensation at the rate of 65% of his weekly wages for a period of time not to exceed 400 weeks, less the amount of compensation already received by him, together with medical bills of $250, less the amount expended by defendant in treating plaintiff, is correct. It is therefore affirmed with costs. The former judgment of this court is recalled and set aside.

TALIAFERRO, Judge (dissenting).

I respectfully dissent from the majority opinion lastly rendered in this case. It turned upon the primary question of fact, viz., has plaintiff proven by a preponderance of the evidence that he suffered the accident alleged by him to have occurred on April 4, 1936?

It was established at the second trial below that at that time his disability was total, and his counsel now concedes that the experience he had on April 6th did not amount to an accident within the intendment of the Workmen's Compensation Law.

In support of this dissent, the following is submitted in addition to what is said on the subject in the original opinion of this court:

I think it is the observation of all judges, trial and appellate, having jurisdiction of compensation cases, that injured workmen never overlook a strong point in their favor and that the hope of receiving compensation immediately after being injured arises spontaneously within them. For this we register no unfriendly criticism. The anxiety he feels for subsistence for himself and family during the period of disability naturally impels him to think seriously along this line. He therefore does not omit, if in possession of his normal mental faculty, consideration and pondering over any fact, circumstance or incident deemed to have favorable bearing upon his right to receive or recover such compensation.

The fact that plaintiff did not inform Doctors Doles and Harmon that he was injured by excessive straining, etc., on April 4, 1936, weighed heavily against him when his case was first considered by us. In the interest of justice and actuated by that purity of motive which should always influence judges and courts in all cases, especially such as plaintiff's, we remanded the case for additional testimony. The record as supplemented has not served to alter the opinion I originally formed as

regards the alleged accident of April 4th. I think the record clearly preponderates in favor of the contention that plaintiff did not, in giving the case history, inform either of these doctors that he was injured on that date. The facts were then fresh in his mind. Every reason argued in favor of him telling of this accident, if it really happened. Naturally he would be supposed to impart to these doctors all the facts favorable to himself and emphasize them. If he did not then tell these physicians of this, the much more serious of the two experiences, we frankly submit that it is unreasonable to believe that such an accident really happened, especially when other circumstances and testimony bearing thereon is considered. The inference being, as stated in our original opinion, that the fear of discontinuance of compensation payments could have served as an incentive to injecting into the case history facts of an accident stronger than those constituting the incident of April 6th.

Dr. Doles is positive he specifically asked plaintiff if he had had an accident or injury prior to April 6th, and that he answered in the negative. It is true that the doctor's report to defendant was actually made up several days after he examined plaintiff but this fact should not detract from the probity of the testimony given by him but, on the contrary, should support and corroborate his independent recollection of the facts as related to him by plaintiff. The report and his independent recollection agree.

Dr. Harmon is positive he took from plaintiff the history of his case, after Dr. Addison had previously done so, and that he only mentioned to him the alleged accident of April 6th. This is clearly disclosed from the doctor's testimony below quoted:

"Q. Doctor, that is all right, but did you take the history of his case, which I am sure is of some importance to this court? You did not make that record, did you? A. I certainly did make the man's record.

"Q. I mean by that you did not take his history on April 10th, 1936, did you? A. I do not recall what date I made it. What is the date of my report? Of course, I may not have·written it on the day I took it. I may have taken it the day before.

"Q. I am asking you if it was April 10, 1936. A. That was his first visit?

"Q. That is what your records show. I am going to ask you, Dr. Harmon, is it not a fact that you were out of the city of Shreveport on that date and that his history was taken by Dr. Addison? A. Dr. Addison may have taken his history, but so did I.

"Q. You do not know what he told Dr. Addison, necessarily, if you were out of town? A. I know what he told me. I cannot testify as to what he told Dr. Addison.

· "Q. Did you take a history also? A. Yes, when I saw him."

Dr. Harmon afterward testified that if he was absent when a patient was sent to him, the history taken by his associate, Dr.·Addison, would be read by him all right, but that he also keeps a record of his cases, independent of anything Dr. Addison, in the beginning, may have had to do with them.

We have not the pleasure of an acquaintance with either of these doctors. In the absence of anything to influence a contrary opinion, we are bound to assume that their credibility before the court is of that high character which the members of the medical fraternity should always enjoy. Surely their interest in the outcome of the case does not in the remotest degree approach that of plaintiff.

Plaintiff's explanation to his own counsel touching the omission by him to mention to· these physicians anything about an injury on April 4th is interesting. We quote from counsel's brief:

"The court may wonder why Moore was not placed on the stand in rebuttal and asked the question as to whether he had given a history of the first accident to Doles. We are frank to state that we asked Moore whether he ·had given a history of the first accident and he was honest enough to state that he simply did not recall what he stated to Doles with reference to either of said accidents, he was in such pain at the time."

Notwithstanding the pain plaintiff was suffering when the history of his case was taken by each doctor, it is certain he mentioned the experience of April 6th, or else they would not have known of it.

It would be a coincidence of the rarest character—too much so to believe true—that these doctors, acting independently of each other, should both fail to record

the fact of the accident of April 4th if plaintiff had mentioned it to them and, in addition, not to recall it from memory, but to vividly remember what he said about the lesser experience two days later.

We have again given diligent consideration to the testimony given by plaintiff, largely quoted in the opinion this day announced, with reference to the accident of April 4th, his action immediately thereafter, etc. We reproduce the following therefrom:

"Q. Did you tell Mr. Baldack, on Saturday April 4th that you were hurt? A. I told him that I had a pain in the back, when trying to raise up.

"Q. Did you tell him that you had gotten hurt lifting, or anything like that? A. Well, no— "

It required considerable prodding to move him to any extent from the declaration that he did not tell his foreman that he then and there injured himself by excessive straining. The foreman was present and was overseeing the work in which plaintiff was engaged. The witness, Prudhomme, says that plaintiff "grabbed himself and says 'I hurt my back'". No other witness saw or heard this and even plaintiff would not and did not testify that such happened.

We think it fairly well established by the testimony of fellow-workmen that plaintiff was complaining of his back hurting him prior to Saturday, April 4th. There is every reason why he should have done so, in view of the multiple sources of focal infection the many physicians found to beset him.

Plaintiff's physical condition is to be lamented. However, the country abounds in cases of like character. He has been afflicted with several focal infections for possibly years. These work slowly but surely to accomplish destruction of physical virility. The physical breakdown he has experienced is but the expected result of such a combination of maladies. The crash came directly as a result of their activities. Legion of strong men have likewise suffered when not engaged in any sort of work or in work not requiring heavy physical exertion. It was not intended that industry should be condemned to absorb the burden of alleviating the suffering and disability present in such cases.